IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES C. BRUNKE, | ) |
| JEFFREY G. HORVITZ, | ) |
| LOUIS M. DeANGELIS, and | ) |
| ARMINAS NEKRASIUS, SR., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| BRENDAN F. KELLY, in his official | ) |
| capacity as Director of the Illinois State | ) |
| Police, ELIZABETH LEAHY, in her | ) |
| official capacity as Illinois State Police | ) |
| Firearm Safety Counsel, and | ) |
| KWAME RAOUL, in his official capacity as | ) |
| Attorney General of the State of Illinois, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AT LAW AND EQUITY

NOW COME the Plaintiffs, JAMES C. BRUNKE, JEFFREY G. HORVITZ,

LOUIS M. DeANGELIS, and ARMINAS NEKRASIUS, SR., by and through

undersigned counsel, and for their Complaint for legal, declaratory and injunctive

relief against the Defendants, BRENDAN F. KELLY, in his official capacity as

Director of the Illinois State Police, ELIZABETH LEAHY, in her official capacity as

Illinois State Police Firearm Safety Counsel, and KWAME RAOUL, in his official

capacity as Attorney General of the State of Illinois, states and alleges as follows:

## INTRODUCTION

The "clear and present danger" prohibitor in Section 65/8(f) of the Illinois

Firearm Owners Identification Card Act ("FOID Card Act") (430 ILCS 65/1, *et seq.*),

where a variety of individuals, including law-enforcement officers, have the power to submit a form to the Illinois State Police ("ISP") that causes the ISP to revoke a person's FOID card – anytime, even months or years later - works a significant and unconstitutional injustice upon law-abiding persons who have done nothing wrong. The revocation comes with no accountability or availability for cardholders to challenge (or even learn about) the circumstances of the revocation. Most importantly, there is no escape valve where one who can prove the revocation was in error can bypass the process through an adversarial hearing or other meaningful procedure.

The above is true even if the revoked cardholder can demonstrate the revocation was based on a mistake or a hoax. Instead, like every other person who has their FOID card revoked pursuant to this subsection, Plaintiffs must submit to an expensive and intrusive psychological examination and certification process, submit certain medical records to the Illinois State Police ("ISP"), and gather character references among friends and family, all of whom must be informed of the circumstances of the revocation – a process made much more difficult when even the cardholder does not know the circumstances of the revocation. This process is an additional indignity on top of the revocation itself.

This flaw and resulting breakdown of the FOID appeal system have wrongfully denied Plaintiffs' rights and endangered public safety, as qualified persons such as Plaintiffs are denied their rights and the ability to self-defense and defense of their families with a firearm while languishing in the FOID appeal

system, during which time their CCLs are also revoked – with no guarantee of their appeals being successful and their rights restored - while criminals who ignore the FOID Card Act and the concealed carry licensing requirements of the Firearms Concealed Carry Act (430 ILCS 66/1, *et seq.*) carry on unaffected.

The right to keep and bear arms for defense of hearth and home is a fundamental individual right (*See District of Columbia v. Heller*, 554 U.S. 570 (2008)), and applies to the Defendants (*See McDonald v. City of Chicago*, 561 U.S. 742 (2010)). The right to the public carry of firearms is also fundamental, as much so as the possession of firearms inside one's home. *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Previous to *Bruen*, in response to the Seventh Circuit's decision in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), Illinois became the last State in America to allow the public carry of firearms for self-defense purposes.

However, the laws governing the licensing of firearm possession and concealed carry in Illinois have resulted in a system that, for some, result in a permanent denial of that right. This is due to a system that is extremely quick to deny or revoke persons' rights, and slow in acknowledging or restoring them. This is especially egregious when Plaintiffs should not be in this system in the first place.

Plaintiffs complain that facially and as applied to them under the facts of the instant case, the ISP's labyrinthine procedures that citizens must navigate in order to obtain relief from a clear and present danger determination—procedures which

lack of any way to challenge the underlying basis of the determination—violate Plaintiffs' due process Fourteenth Amendment rights.

Plaintiffs also complain that facially and as applied to them under the facts of their individual cases, ISP's determination that Plaintiffs pose(d) a clear and present danger and ISP's revocation of Plaintiffs' respective FOID Cards—acts which deprive/deprived Plaintiffs of their ability to lawfully keep and bear arms— violate/violated Plaintiffs' Second Amendment rights.

This action seeks to restore Plaintiffs' right to keep and bear arms in a manner consistent with their rights to due process. Plaintiffs seeks declaratory relief, as well as preliminary and permanent injunctive relief, and nominal damages.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202, and 42 U.S.C. § 1983 because this action seeks to redress the Defendants' deprivation, under color of state law, of rights protected by the U.S. Constitution.

2.     Venue lies in this Court pursuant to 28 U.S.C. § 1391 because the events and omissions giving rise to this action are harming/have harmed Plaintiffs in this District.

## PARTIES

Plaintiffs

3.      Plaintiff James L. Brunke is a natural person who resides in Park Ridge, Cook County, Illinois. He is a long-haul delivery truck driver who has also been a partner in a Fulton Market meat distributorship, and also spent 8 years as a Cook County Sheriff's Deputy. He has never been disciplined or dismissed for violence. He possesses an Illinois FOID and CCL.

4.      Plaintiff Jeffrey G. Horvitz is a natural person who resides in Chicago, Cook County, Illinois. He is 70 years old. He lives in Chicago, and has lived in the Chicago area his whole life. Horvitz has a B.S. in Computer Science from DePaul University. He is retired after being Vice-President of Sales for a technology consulting company in Schaumburg for approximately 20 years. Before that, he was a salesman for a financial research company in Chicago. He was never been disciplined or dismissed for violence. Until the events described herein, he possessed an Illinois FOID, as well as a CCL for ten years.

5.      Horvitz also started a Chicago studio for Krav Maga self-defense training, which he ran for approximately 10 years. He managed the business, and was also a trainer. He offered free self-defense classes for women, law enforcement, and crime victims. He is a father of three grown children, and has lived with his partner for approximately 18 years.

6.      Plaintiff Louis M. DeAngelis is a natural person who resides in Lincolnwood, Cook County, Illinois. He is 54 years old. DeAngelis is an attorney and

5

property manager. He has a B.A. from American University's School of International Service, and a J.D. from the University of Southern California. He is also a Commissioner on the Village of Lincolnwood Plan Commission. He has never been disciplined or dismissed from any employment for violence. Until the events described herein, he possessed an Illinois FOID and CCL.

7.      More specifically, DeAngelis had a CCL for nearly 10 years, prior to the events described herein. In that entire time DeAngelis had never brandished his firearm, let alone taken it out of its holster, in any type of remotely hostile situation. This is in spite of the fact that DeAngelis has worked in some fairly high-crime neighborhoods, including with break-ins at the properties he has managed, and has had to deal with relatively violent people under the influence of various substances.

8.      DeAngelis is also well-trained in firearm use and safety. As co-chair of his synagogue's security committee, he has not only trained in connection with his during the course of CCL and other basic training, but also participated in a firearms proficiency testing program supervised by a licensed instructor based upon the standards utilized by the Department of Homeland Security.

9.      Plaintiff Arminas Nekrasius, Sr. is a natural person who resides in Romeoville, Will County, Illinois. He is 43 years old. He is married with three children. For the last 17 years, Nekrasius has owned his own business which repairs semi-trucks. He has never been disciplined or dismissed from any

employment for violence. Until the events described herein, he possessed an Illinois FOID card.

<u>Defendants</u>

10.    Defendant Brendan F. Kelly is the Director of the Illinois State Police ("ISP"). The ISP is a department of the executive branch of the State of Illinois created by statute, 20 ILCS 2605/2605-1, *et seq*. Under the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1, *et seq*. ("FOID Card Act"), the ISP is charged with administering the system for consideration applications for, granting, denying, and/or revoking individual licenses to possess firearms under the FOID Card Act.

11.    Defendant Kelly is the ISP employee directly responsible for the administration of the FOID Card Act. As such, Defendant Kelly is responsible for the ISP's failure to provide a means by which someone whose FOID card has been revoked due to an erroneous clear and present danger report can correct or challenge that determination. He is sued in his official capacity pursuant to the principles set forth in *Ex Parte Young*, 209 U.S. 123 (1908).

12.    Elizabeth Leahy is the Firearms Safety Office Counsel of the Office of Firearms Safety ("OFS"), a division of the ISP which is responsible for developing protocols and procedures for evaluating risk for individuals whose access to firearms has been denied or revoked under Illinois law and overseeing and evaluating all appeals of FOID card and concealed carry license (CCL) -holders with respect to the legality for restoration of firearms rights and privileges. Having the

power to make decisions in these programs, the OFS is an administrative agency of the State of Illinois as defined by 735 ILCS 5/3-101.

13.     As Firearms Safety Office Counsel of the OFS, Defendant Leahy is directly responsible for the ISP's failure to provide a means by which someone whose FOID card has been revoked due to an erroneous clear and present danger report can correct or challenge that determination. She is sued in her official capacity pursuant to the principles set forth in *Ex Parte Young*, 209 U.S. 123 (1908).

14.     Kwame Raoul is the Attorney General of the State of Illinois.  In Raoul's official capacity, he is responsible for executing and administering the laws of the State of Illinois, including Sections 65/1.1, 65/8(f), and 65/8.1(d) of the Firearm Owners Identification Card Act (430 ILCS 65/1, *et seq.*). Defendant Attorney General Raoul has enforced the challenged laws and practices against Plaintiffs and is in fact presently enforcing the challenged laws practices against Plaintiffs.  He is sued in his official capacity pursuant to the principles set forth in *Ex Parte Young*, 209 U.S. 123 (1908).

## STATEMENT OF FACTS

### Brunke

15.     On February 1, 2023, Brunke was on the road driving for UPS with his partner. They would leave on Monday, drive to California, and return by late-Thursday night. On that date, Brunke was on the way back from California, but still in the western part of the United States. On Wednesday, February 1, 2023, in

the morning, his girlfriend and he had an argument over the telephone about money. Brunke and his girlfriend, and her daughter, had been living together for approximately 19 months. Brunke's girlfriend was screaming at him, and Brunke ended the argument by hanging up, especially since it was 6:00AM where he was at that time. When his driving shift ended at approximately 8:00-9:00PM that evening, Brunke tried to call and text his girlfriend, but was unable to reach her. Brunke did not threaten violence or harm to his girlfriend in any way, whether by phone, text, or any other means.

16.     The next morning, February 2, 2023, while still driving home to Illinois, Brunke received an e-mail from the Illinois State Police that his FOID and CCL status had changed. He pulled over and saw to his astonishment that his licenses were revoked. When he saw the ISP e-mails regarding his FOID and CCL, he called the Park Ridge Police Department for information. The Desk Sergeant told him that Susan had been in and had taken out an Order of Protection in the Circuit Court of Cook County.

17.     Even though Brunke knew that whatever allegations his girlfriend had made against him were false, he did not want to put himself in a position in which he arrived home and was accused of committing some sort of violence or threat with one of the firearms in his home. Brunke called a friend who was a retired officer from the Chicago Police Department, who went to Brunke's house when he arrived back in Illinois, and who took possession of Brunke's firearms.

9

18.     When Brunke arrived home, his girlfriend and her daughter were not there, so he went to sleep. When he woke up, he looked around his condo and saw that his girlfriend had ruined his clothes in the closet by spraying them with bleach, and that she had defecated in Brunke's underwear and folded it back up and placed it in his drawer. She also damaged or took numerous other items throughout the condo. Brunke attempted to make a police report, but the Park Ridge Police Department refused to do so, claiming that because his girlfriend lived there, she had to right to steal and destroy Brunke's personal property.

19.     The next day (Friday, February 3, 2023), the Park Ridge P.D. asked Brunke to come in to serve him with the Order of Protection. He also turned in his FOID card to the Park Ridge P.D. at that time. Upon information and belief, his girlfriend left town with her daughter for Florida shortly after that. He has not seen her since he left for California on January 30, 2023, and he has had no contact with her since the telephone argument the morning of February 1, 2023.

20.     On February 22, 2023, Brunke went to the court for the Order of Protection hearing. His girlfriend was not there, and the Emergency Order of Protection was vacated and the case was dismissed. Brunke has never seen the actual Petition for Order of Protection, so he has no knowledge what he was accused of doing.

21.     Brunke had hoped the matter would have ended there, so that at least he would be able to get his FOID and CCL back from the ISP record challenge appeal. But it did not.

22.     On or about February 2, 2023, the ISP Division of Administration revoked Brunke's FOID Card based on the legal disability of being "a clear and present danger" (*see* 430 ILCS 65/8.1(d)(2).  20 Ill. Adm. Code 1230.120(b)), and sent him a letter to that effect on February 3, 2023. Brunke does not know who submitted it, and did nothing to deserve it. Brunke did not do or say anything threatening at the Park Ridge Department in person, nor did he say anything threatening towards anyone while on the phone with them.

23.     Since a law enforcement official is only supposed to submit a clear and present danger report when the licensee "demonstrates threatening physical or verbal behavior, such as violent, suicidal, or assaultive threats, actions, or other behavior, as determined by a . . . law enforcement official," and since Brunke did nothing of the sort, he is completely in the dark as to who made the report against him, or what the allegations against him could possibly have been. Brunke was never questioned about any of the allegations, nor was there (to his knowledge) any investigation.

24.     Brunke has since had his FOID and CCL returned to him, but only after going through the appeal process with the FOID Card Review Board, which included having to obtain a psychological certification that he was not a danger.

<u>Horvitz</u>

25.     Horvitz resides across the street from Millenium Park. On multiple occasions, Horvitz had communicated with the Deputy Commissioner to express concern about safety hazards and noise violations at Millenium Park, and also to

11

discuss what Horvitz believed was an improper prohibition on carrying concealed firearms while crossing through Millenium Park. The Deputy Commissioner told Horvitz her opinion was that the prohibition was valid, and she was going to enforce it. Horvitz always complied with this instruction, and did not enter Millenium Park at all if he was carrying concealed.

26.     On November 6, 2023, Horvitz had lunch plans with the Deputy Commissioner to discuss his concerns. The two decided to meet in person since they communicated on multiple occasions. On that date, the Chicago Cultural Center ("CCC") at 78 East Washington Street in Chicago had two public entrances – one on Washington Street and one on Randolph Street. At all relevant times, the Washington Street entrance had a "No Firearms" decal pursuant to Section 66/65(d) (which Horvitz did not know), and the Randolph Street entrance did not. On that day, Horvitz, who possessed a CCL, was carrying a concealed firearm, and entered the lobby of the CCC through the "unmarked" Randolph Street entrance to meet the Deputy Commissioner. When the Deputy Commissioner came into the lobby, she asked if Horvitz was carrying a firearm. When Horvitz said yes, the Deputy Commissioner immediately canceled lunch and told him to leave the building. Horvitz did this. At no point did Horvitz do or say anything threatening to anyone, and at no point did he display his firearm.

27.     On December 26, 2023, Horvitz went to the Chicago Cultural Center to attempt to speak with the Deputy Commissioner. Horvitz entered the same Randolph Street entrance as prior, still without any sign pursuant to 430 ILCS

12

66/65(d), but was not going to go further, as he was carrying a concealed firearm. However, the usher at the door invited him in, and directed him to the fourth floor, where the executive offices are located. When he reached the fourth floor, an usher told him the Deputy Commissioner could not meet with him and he needed to leave. Once again, Horvitz said nothing and just left the CCC. At no point did Horvitz do or say anything threatening to anyone, and at no point did he display his firearm.

28.     On his way walking back home, on Michigan Avenue, he was stopped by 5 or 6 Chicago Police officers who pulled up on the street next to him. One of the officers asked Horvitz if he was carrying a firearm, and Horvitz said yes. The officer asked if Horvitz had a CCL, and Horvitz said yes, and upon request showed it to the officer. The officer told Horvitz to have a nice day, and the officers all left. Horvitz was not arrested or further detained beyond this brief conversation, and Horvitz walked home. At no point during his interaction with the Chicago Police officers did Horvitz do or say anything threatening to anyone.

29.     On or about January 9, 2024, Horvitz received a notice from the Illinois State Police that his FOID and CCL were revoked because Horvitz had been deemed a "clear and present danger." *See* 430 ILCS 65/8.1(d)(2).  20 Ill. Adm. Code 1230.120(b).

30.     Since then, Horvitz has been pursuing an appeal, first with the FOID Card Review Board and currently with the Cook County Circuit Court. He has complied with all appeal requirements, including obtaining a mental health certification. To date, because someone unqualified to evaluate Horvitz's mental

health has made an unfounded diagnosis about Horvitz, he has since been stripped of his Second Amendment rights until at least January, 2029.

31.     Further, Horvitz cannot fairly or reasonably respond to allegations about which he has virtually no information, yet this is the mandated only way to appeal. He has so far gone through the appeal process with no information about what he is accused of having done.

<u>DeAngelis</u>

32.     On September 13, 2022, DeAngelis was on his driveway, taking photos of the flooded, liquified concrete, and muddy conditions in the alley behind his house caused by a contractor of the owner of the property on the other side of the alley who had been undertaking the excavation and build-out of his basement for months. Aa a result, whenever DeAngelis or his family members would drive through the alley to their driveway, their cars would become covered in mud and concrete. DeAngelis had been complaining to the owner about the situation in the alley for months. Seeing no change, DeAngelis and his wife had also lodged complaints with the Village. Both the property owner and his contractor clearly were upset about their complaints, and the Owner was very hostile to DeAngelis and his wife regarding the issue. The Owner consistently dismissed DeAngelis's concerns and told him that he would address the alley when he was done with the project.

33.     On September 13, 2022, while DeAngelis was taking photos, the owner's contractor came out the back gate and the two exchanged angry words about the condition of the alley. DeAngelis wanted to know when it was going to be

cleaned up and that the contractor should put stones down. DeAngelis mentioned the Complaints to the Village, and the Contractor stated "I know. F**k the Village and f**k you," which DeAngelis found very jarring and hostile. DeAngelis said he was the worst contractor he had ever seen, and the contractor again said, "F**k you," balled up his fist and started coming toward DeAngelis.

34.     DeAngelis normally carries both his firearm and pepper spray. He took a step or two back and reached for his pepper spray under his shirt when he realized the pepper spray was not there. While DeAngelis was reaching for the pepper spray, the contractor saw DeAngelis's firearm, stopped coming toward him for a moment, and started screaming words to the effect of how DeAngelis thought he was tough, and added, several times, how DeAngelis was not "the only one to have a gun. I have a gun too." The contractor then reached behind his back and started coming toward DeAngelis again. DeAngelis started moving backwards, yelling at the contractor to "get off [his] property." The contractor continued coming toward DeAngelis, apparently with the intention to hit DeAngelis or worse.

35.     DeAngelis, afraid the contractor was going to attack him or try to take his firearm, drew it in low-ready behind him. The moment DeAngelis did this the contractor stopped and backed off DeAngelis's property. DeAngelis immediately then re-holstered the firearm and continued to walk backward until he reached the walk gate to his backyard. The contractor continued to scream and swear, with anti-Semitic hate speech mixed in. As DeAngelis was walking toward his porch to go into

his house, he responded back to the contractor that they would just see what the police had to think about all this.

36.     DeAngelis did not end up contacting the police; he thought the incident was over and did not want to escalate the conflict even further. DeAngelis calmed down, put his firearm into the safe, grabbed his pepper spray and went to Home Depot to look for something he needed for work.

37.     While at Home Depot, probably 45 minutes after the assault on him, DeAngelis received a call from Skokie dispatch, telling him that Lincolnwood P.D. wanted to speak with him. DeAngelis went back to his home and parked in front, and numerous officers came up to him. Some officers were in the back of his home, speaking with the contractor. After approximately 15 minutes, an officer came up to the front of DeAngelis's house and arrested him for disorderly conduct and aggravated assault, both misdemeanors.

38.     Though the charges were later dismissed *nolle prosequi*, the Illinois State Police revoked DeAngelis's FOID card on September 19, 2022, suspended his CCL on the same date, and revoked his CCL a year later on September 18, 2023, because the Lincolnwood P.D. submitted a report labeling DeAngelis a "clear and present danger" pursuant to 430 ILCS 65/8(f) shortly after the arrest. *See* 430 ILCS 65/8.1(d)(2). 20 Ill. Adm. Code 1230.120(b). This is despite the fact that DeAngelis did and said nothing threatening to the officers, and was not even in possession of a firearm at the time.

39.     This is also despite the fact that DeAngelis was defending himself on his own property during the occurrence, and was at no time the aggressor.

40.     To date, because someone unknown and unqualified to evaluate DeAngelis's mental health has made an unfounded diagnosis about DeAngelis, he has since been stripped of his Second Amendment rights until at least September, 2027.

<u>Nekrasius</u>

41.     On August 4, 2022, the ISP sent a letter to Nekrasius revoking his FOID card due to his being a "clear and present danger" pursuant to 430 ILCS 65/8(f).

42.     Nekrasius was later told the allegedly-dangerous conduct was a phone call, though Nekrasius was neither informed with whom he allegedly spoke, nor what he supposedly said that was dangerous or threatening.

43.     Through later-received information from the ISP, the allegedly-dangerous conduct was on December 2, 2021.

44.     Nekrasius cannot fairly or reasonably respond to allegations about which he has virtually no information, yet this is the mandated only way to appeal.

45.     However, at no point did Nekrasius do or say anything threatening to anyone.

46.     Further, there is no factual reason why – if Nekrasius's alleged actions in December, 2021 did not merit him being labeled as a "clear and present danger" at the time, that he should have been deemed a "clear and present danger" – such

17

that the ISP had the sudden need to revoke Nekrasius's FOID card – eight months later.

47.     To date, because someone unknown and unqualified to evaluate Nekrasius's mental health has made an unfounded diagnosis about Nekrasius, he has since been stripped of his Second Amendment rights until at least December, 2026.

## ALL PLAINTIFFS

48.     Plaintiffs did not meet, do not meet and have never met Illinois' definition of a "clear and present danger." This definition is as follows:

"Clear and present danger" means a person who:

(1)     communicates a serious threat of physical violence against a reasonably identifiable victim or poses a clear and imminent risk of serious physical injury to himself, herself, or another person as determined by a physician, clinical psychologist, or qualified examiner; or

(2)     demonstrates threatening physical or verbal behavior, such as violent, suicidal, or assaultive threats, actions, or other behavior, as determined by a physician, clinical psychologist, qualified examiner, school administrator, or law enforcement official.

430 ILCS 65/1.1.

49.     Upon information and belief, at no time did any physician, clinical psychologist, or qualified examiner determine that any of the Plaintiffs communicated a serious threat of physical violence against a reasonably identifiable victim or posed a clear and imminent risk of serious physical injury to himself or

another person. Plaintiffs are further informed and believe that there exists no relevant and reliable information on which such a determination could be made.

50.     Upon information and belief, at no time did any physician, clinical psychologist, or qualified examiner directly or indirectly notify ISP that any of the Plaintiffs communicated a serious threat of physical violence against a reasonably identifiable victim or posed a clear and imminent risk of serious physical injury to himself or another person. Plaintiffs are further informed and believe that there exists no relevant and reliable information on which such a determination could be made.

51.     Upon information and belief, at no time did any physician, psychologist, qualified examiner, school administrator or law enforcement officer notify ISP of facts showing that any of the Plaintiffs demonstrated any threatening physical or verbal behavior; any violent, suicidal or assaultive threats or actions; any behavior similar to any threatening physical or verbal behavior; or any behavior similar to any violent, suicidal or assaultive threats or actions. Plaintiffs are further informed and believe that there exists no relevant and reliable information on which such a determination could be made.

Clear and Present Danger Relief Procedures:

52.     ISP's procedures for restoration of Plaintiffs' firearm rights require that:

> a.     Plaintiff provide a notarized statement in his own words detailing (i) any and all mental health admissions; (ii) his current mental status and condition; (iii) his mental health history, including any prior treatment or admissions; (iv)

whether he has complied with treatment and/or medications; (v) the dates and details of all actual or alleged acts of suicide or violence.

b.    Plaintiff provide the name and address of any agency and the date of any legal action and the county and state where any records are held with respect to any actual or alleged acts of suicide or violence in which law enforcement or the courts were involved.

c.    Plaintiff provide the name and location of any medical provider with respect to any actual or alleged acts of suicide or violence in which any medical care was provided.

d.    Plaintiff provide information to support his suitability for the restoration of his firearm rights including evidence that he will not be likely to act in a manner dangerous to public safety and that granting relief would not be contrary to the public interest.

e.    Plaintiff provide all psychiatric and counseling records related to mental health diagnosis or treatment provided to him during the previous five years.

f.    Plaintiff submit to and provide a forensic psychiatric evaluation on a specific form, performed by an Illinois licensed psychiatrist or clinical psychologist.

g.    Plaintiff provide certified copies of any court records that address his mental status or allegations he was threatening to harm himself or others; engaged in violence; or abused alcohol or drugs.

h.    Plaintiff provide at least two notarized letters from adults who are aware of the circumstances regarding the revocation of his FOID Card that state the adults': (i) full names, dates of birth, and relationships to Plaintiff; (ii) knowledge of the circumstances regarding the revocation of Plaintiff's FOID Card; (iii) opinions of Plaintiff's current mental health condition and risk of his dangerousness to himself or others; and (iv) opinion as to whether Plaintiff's possession of a firearm would be contrary to the public interest.

1230.70(b)(3)(A);
https://isp.illinois.gov/StaticFiles/docs/FirearmsSafety/Checklists/Final%20Checklis

ts/C&P%20Less%20Than%205%20Yr%20Prohibitor%20Requirements%20Checklist
.pdf

53.     The facts and circumstances giving rise to the respective Plaintiffs'

clear and present danger determinations and FOID Card revocations render the

ISP's procedures described above wholly arbitrary and constitutionally inequitable,

both facially and as applied to the respective Plaintiffs.

54.     ISP does not permit DeAngelis and Nekrasius, and did not permit

Brunke and Horvitz, to challenge ISP's determination that the respective Plaintiffs

meet the definition of a clear and present danger in the first instance rather than to

apply for relief from that determination.

55.     The Plaintiffs DeAngelis and Nekrasius wish to challenge ISP's

determination that they meet the definition of a clear and present danger in the

first instance rather than to apply for relief from that determination, and Brunke

and Horvitz would have wished to do so, but there is no mechanism to do so - in an

adversarial hearing before a judge or a neutral decisionmaker - or otherwise.

56.     The Defendants' clear and present danger process allows for the

stripping of individuals' constitutional rights without any constitutional safeguards.

As more specific examples, the process allows for:

- No requirement for oath or affirmation for the factual basis of the "clear and present danger" report that leads to revocation;

- No indicia of reliability of factual basis for revocation;

- Hearsay accepted evidence to trigger revocation;

- No access by the revoked person to the alleged factual basis of revocation, either before or after revocation;

- No pre-revocation hearing;

- Burden of proof for revocation is flipped, such that there is a loss of Second Amendment rights by fiat with the individual required to initiate action and to prove a negative;

- No objective criteria to determine "clear and present dangers;"

- Law enforcement officers and school administrators lack the qualifications to make "determinations" about persons' mental health;

- "Present" has no meaning in practice; triggering event could be months or years before, which violates the clear statutory temporal requirement.

57.     The Defendants' clear and present danger process allows law enforcement officers to 'side-step' all judicial safeguards and strip individuals of their Second Amendment rights for an indefinite period of time by simply filling out forms and sending documents amongst themselves. More specifically, Illinois' clear and present danger process allows a law enforcement officer to fill out a form and transmit it to the Illinois State Police—and then ISP decides based on that form whether to strip an individual of his Second Amendment rights. Illinois' clear and present danger process thus allows law enforcement officers alone to strip individuals of their Second Amendment rights without any check by the judiciary, even months or years later.

58.     In the case of persons who can prove their revocation was the result of error or outside deceit, this deprivation is unconstitutional. Upon information and belief, no other State has a statutory clear-and-present-danger process that bypasses judicial review by allowing law enforcement officers to strip individuals of

their Second Amendment rights for an indefinite period of time - based upon nothing more than their say-so and the okay of the ISP - without requiring full adversarial hearings. In this regard, Illinois is alone.

## COUNT I: VIOLATION OF RIGHT TO PROCEDURAL DUE PROCESS
## U.S. CONST. AMEND. XIV, 42 U.S.C. §1983

59.     Plaintiffs repeat, reallege, and incorporate Paragraphs 1 through 58, inclusive, as if fully restated herein.

60.     The Defendants' determination that the respective Plaintiffs met the definition of a clear and present danger caused ISP to revoke the Plaintiffs' FOID cards and prevents ISP from issuing the Plaintiffs new FOID cards. This also resulted in the respective Plaintiffs' CCLs being suspended with no opportunity to regain them until their FOID Cards are reinstated.

61.     The Defendants' refusal to permit the Plaintiffs to challenge their determination that the respective Plaintiffs meet the definition of a clear and present danger in the first instance, rather than to apply for relief from that determination, both facially and as applied to the Plaintiffs, violates their right to due process under the Fourteenth Amendment.

62.     Plaintiffs, due to the Defendants' enforcement and application of an appeal system that, facially and as applied to them, is arbitrary and allows no opportunity for resolution short of an uncertain, lengthy and intrusive process, have been denied their constitutionally guaranteed right procedural due process under the Fourteenth Amendment.

63.    By so burdening the Plaintiffs' ability to possess a FOID card, and likewise a CCL, the Defendants have not only unjustifiably denied Plaintiffs their rights but have potentially effectively imposed an unending ban on their right to keep and bear arms for self-defense.

64.    Plaintiffs have been affected by the Defendants' actions and deprived of their fundamental right to armed self-defense. None of them are persons who were historically prohibited from possessing firearms, and they have not done anything since to remove themselves from those categories of persons able to exercise this fundamental right.

65.    The risk of the Defendants' erroneous deprivation of Plaintiffs' interest through the FOID clear and present danger appeal process is great, as the Plaintiffs have been deprived of their fundamental rights with no opportunity to correct or undo the deprivation - short of a lengthy, arbitrary, and intrusive process - and the consequences include the Plaintiffs' sustaining of a severe or fatal injury should they have suffered/suffer a violent attack and been/be unable to properly defend themselves.

66.    The value of additional or substitute procedural safeguards, such as implementing a method whereby Plaintiffs can challenge the categorization as a clear and present danger, and the resulting FOID card revocation, within a reasonable timeframe and without being subjected to the clear and present danger appeal requirements, responding to inquiries, and offering hearings when appropriate, is high.

67.     The Defendants, under the color of law, both facially and as-applied, have deprived and are depriving Plaintiffs of their right to keep and bear arms, in violation of their procedural due process rights under the Fourteenth Amendment to the United States Constitution. Plaintiffs have been/are thus damaged in violation of 42 U.S.C. §1983. Plaintiffs are therefore entitled to declaratory and preliminary and permanent injunctive relief against the continued deprivation of their rights.

68.     Plaintiffs also seek nominal damages for the violation of their Fourteenth Amendment rights by the Defendants.

## COUNT II: VIOLATION OF RIGHT TO KEEP AND BEAR ARMS
## U.S. CONST. AMENDS. II AND XIV, 42 U.S.C. §1983

69.     Plaintiffs incorporate and reallege Paragraphs 1 through 58, inclusive, as if fully restated herein.

70.     The Defendants' determination that Plaintiffs met the definition of a clear and present danger caused ISP to revoke their FOID cards and prevents ISP from issuing Plaintiffs new FOID cards. This also resulted in Plaintiffs' CCLs being suspended with no opportunity to regain them until their FOID cards are reinstated.

71.     Through Defendants' wrongful revocation of Plaintiffs' FOID cards by erroneously labeling them as a clear and present danger, with no opportunity to challenge the categorization, both facially and as applied to Plaintiffs, violates their right to keep and bear arms for self-defense under the Second Amendment.

72.    By so burdening Plaintiffs' ability to possess a FOID card under the FOID Card Act, and likewise a CCL, and by the imposition of any firearm-related disabilities upon them as a consequence thereof, facially and as applied to them under the facts of the instant case, the Defendants have not only unjustifiably denied the Plaintiffs their rights but have effectively imposed an indeterminate ban on Plaintiffs' (except Brunke, who was able to eventually regain his FOID card and CCL) right to keep and bear arms for self-defense.

73.    The deprivation of Plaintiffs' ability to lawfully keep and bear arms is inconsistent with the Nation's historical tradition of firearm regulation.

74.    The deprivation of individuals' rights to keep and bear arms, when that individual has a claim that the basis is false, without allowing that individual to directly challenge the basis for that deprivation in a meaningful proceeding, is inconsistent with the Nation's historical tradition of firearm regulation.

75.    Defendants' refusal to permit direct challenges to clear and present danger determinations in the first instance, rather than only to permit individuals to apply for relief from those determinations, violates the Second Amendment rights to keep and bear arms.

76.    Plaintiffs have been injured by the Defendants' actions and deprived of their fundamental right to armed self-defense. They are not persons who were historically prohibited from possessing firearms, and have not done anything since to remove themselves from those categories of persons able to exercise this fundamental right.

77.     The Defendants, under the color of law, both facially and as-applied, have deprived and are depriving Plaintiffs of their right to keep and bear arms, in violation of the Second and Fourteenth Amendments to the United States Constitution. Plaintiffs were and are thus damaged in violation of 42 U.S.C. §1983. Plaintiffs are therefore entitled to declaratory and preliminary and permanent injunctive relief against the continued deprivation of their rights.

78.     Plaintiffs also seek nominal damages for the violation of their Second Amendment rights by the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, JAMES C. BRUNKE, JEFFREY G. HORVITZ, LOUIS M. DeANGELIS, and ARMINAS NEKRASIUS, SR., respectfully pray this Honorable Court enter judgment in their favor and grant them the following forms of relief:

a.      find that the Defendants, facially and/or as applied to Plaintiffs, have unjustifiably denied Plaintiffs their Second Amendment right to keep and bear arms for self-defense through the use of 430 ILCS 65/1.1 and 65/8.1(d)(2), as well as 20 IAC 1230.120(b), and the lack of any hearing or other meaningful procedure whereby Plaintiffs can challenge the deprivation as erroneously- and falsely-based;

b.      find that the Defendants, facially and/or as applied to Plaintiffs, have unjustifiably denied Plaintiffs their Fourteenth Amendment procedural due process rights through the use of 430 ILCS 65/1.1 and 65/8.1(d)(2), as well as

20 IAC 1230.120(b), and the lack of any adversarial hearing or other meaningful procedure whereby Plaintiffs can challenge the deprivation of their firearm rights as erroneously- and falsely-based;

c.      enter an order granting Plaintiffs injunctive relief that enjoins the Defendants from further deprivation of their rights to keep and bear arms and right to procedural due process through the use of 430 ILCS 65/1.1 and 65/8.1(d)(2), as well as 20 IAC 1230.120(b), and the lack of any adversarial hearing or other meaningful procedure whereby Plaintiffs can challenge the deprivation of their firearm rights as erroneously- and falsely-based;

d.      enter a mandatory injunction requiring the Defendants to issue a FOID card and CCL (where applicable) to Plaintiffs and relieve them of any and all other firearm-related disabilities the Defendants may have imposed upon them as a consequence of the false clear and present danger determinations;

e.      enter a mandatory injunction requiring the Defendants to implement a meaningful procedure whereby Plaintiffs can challenge their categorization as clear and present dangers, and the resulting FOID card revocations, within a reasonable timeframe in an adversarial proceeding and without being subjected to the clear and present danger appeal requirements;

f.      award Plaintiffs nominal damages for the 42 U.S.C. § 1983 violations of Plaintiff's Fourteenth and Second Amendment rights;

28

g.      award Plaintiffs attorney's fees and costs, pursuant to 42 U.S.C. §1988

and F.R. Civ. P. 54(d); and,

h.      award Plaintiffs such other and further relief as it deems just.


Dated: September 13, 2024               Respectfully submitted,


                                    _____/s/ David G. Sigale_____
                                        One of the Attorneys for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

Gregory A. Bedell (Atty. ID# 6189762)
Gregory A. Bedell, Chartered
33 North Dearborn Street, 10th Floor
Chicago, IL 60602
Phone 312.307.7558
gbedell@gabchartered.com

Attorneys for Plaintiffs